UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
NORTHERN DIVISION

JOHN D. SCHMELZLE,               )
                                 )
         Plaintiff,              )
                                 )
    vs.                          )     Case No. 2:17 CV 54 (JMB)
                                 )
NANCY A. BERRYHILL,              )
Deputy Commissioner of Operations, )
Social Security Administration,  )
                                 )
         Defendant.              )

## MEMORANDUM AND ORDER

This matter is before the Court for review of an adverse ruling by the Social Security

Administration.  The parties have consented to the jurisdiction of the undersigned United States

Magistrate Judge pursuant to 28 U.S.C. § 636(c).

## I. Procedural History

On October 17, 2014, plaintiff John D. Schmelzle protectively filed applications for

disability insurance benefits, Title  II, 42 U.S.C. §§ 401 *et seq*., and supplemental security

income, Title XVI, 42 U.S.C. §§ 1381 *et seq.*, with an alleged onset date of May 3, 2013.[1]  (Tr.

207-08, 209-14; see also Tr. 141, 142).  Plaintiff subsequently amended his alleged onset date to

October 8, 2014.  (Tr. 293).  After plaintiff's applications were denied on initial consideration

(Tr. 145-50), he requested a hearing before an Administrative Law Judge (ALJ).  (Tr. 151-52).

Plaintiff and counsel appeared for a hearing on May 19, 2016.  (Tr. 45-63).  Plaintiff

testified concerning his disability, daily activities, functional limitations, and past work.  The

ALJ also received testimony from vocational expert Jacqueline R. Bethell, MS.  The ALJ issued

---

[1] On January 30, 2014, an Administrative Law Judge denied plaintiff's previous application for Title II benefits in which he alleged disability beginning January 10, 2010.  (Tr. 78-88).

a decision denying plaintiff's applications on July 14, 2016. (Tr. 22-36). The Appeals Council denied plaintiff's request for review on June 23, 2017. (Tr. 1-6). Accordingly, the ALJ's decision stands as the Commissioner's final decision.

## II. **Evidence Before the ALJ**

### A. **Disability and Function Reports and Hearing Testimony**

Plaintiff, who was born on November 12, 1968, was 45 years old on the amended alleged onset date. He completed high school with some special education classes and received training in building trades while in prison. (Tr. 236, 45). Between 2000 and 2009, plaintiff worked as a custom cabinet builder. (Tr. 244). He was incarcerated from May 2010 to June 2011. (Tr. 85). He worked for an auto parts business in 2012 and 2013, cleaning and fueling trucks and loading salvaged auto parts for shipment. (Tr. 246). He returned to custom woodworking in early 2013. (Tr. 45-46). That job ended on May 3, 2013 when he was incarcerated "due to [a] bipolar episode." Disability Report; but see Function Report (stating he was fired from job after being arrested following an altercation with his wife) (Tr. 236, 254).

Plaintiff listed his impairments as bipolar disorder, attention deficit hyperactivity disorder (ADHD), anxiety disorder, obsessive compulsive disorder, antisocial personality, a gunshot wound to his left hand, carpal tunnel, rotator cuff problems, and dyslexia. (Tr. 235). He was prescribed medications for the treatment of bipolar disorder, mood disorder, depression, ADHD, poor sleep, and high cholesterol, in addition to an anti-inflammatory for musculoskeletal pain. (Tr. 239).

Plaintiff stated in his December 2014 function report that he lived with his sister and brother-in-law. (Tr. 249-56). His daily activities consisted of smoking, drinking coffee, and sitting. He did laundry, washed dishes, and mowed grass. He did not prepare his own meals and

2

ate only one meal a day. He no longer cared about his appearance, leaving it to others to remind him to take care of his grooming and personal hygiene. He slept about two hours a night. He was capable of managing his finances. He had pain in his shoulders and lacked strength and feeling in his left hand and thus could no longer participate in his former hobbies of hunting, fishing, and woodwork. He was able to walk without restriction. He stated that he was always aware of his surroundings but did not pay attention. He could concentrate for 15 to 30 minutes at a time, but had difficulty finishing what he started and could follow spoken instructions more easily than written instructions. He did not like being around other people and did not get along with authority figures or handle changes in routine well. Plaintiff had difficulties with lifting, reaching, memory, completing tasks, concentrating, following instructions, and getting along with others. The Field Office interviewer did not note any unusual behaviors. (Tr. 233).

Robyn Schmelzle, plaintiff's estranged wife, completed a third-party function report in December 2014. (Tr. 260-67). She had known plaintiff since 2011. She described him as "not social" and "not motivated for any activity;" indeed, she said, he spent his days looking out the window, watching television, and drinking coffee. She reported that he only slept two hours a night and was depressed to the point that he did not care about eating or his appearance. According to his wife, plaintiff could not lift more than 10 pounds without shoulder pain. He had no grip or dexterity in his hands and could no longer do things like cook. In addition, he could not control his temper and so was unable to tolerate being around others. He argued with others "all the time because he thinks he's always right" and became angry if someone told him how to do something. (Tr. 264-65). He needed reminders to go places and was unable to concentrate for more than a few minutes. He misread written instructions and forgot half of any verbal instructions. In response to stress, he became angry, caused arguments, and threw things.

She also described some idiosyncrasies; for example, he was a hoarder and would not use the washer and dryer for fear that they would break. He also believed that there was always someone out to get him and he was "afraid to get old." In a narrative section, Ms. Schmelzle wrote that plaintiff had suffered abuse as a child and "cause[s] problems with everyone around him." (Tr. 267).

Plaintiff testified at the May 2016 hearing that he moved to his sister's house after separating from his wife in 2013. His sister restricted him to the lower level of her split-level house because she did not want him around the children who lived in the home. (Tr. 55, 62-64). He spent the days walking around in the woods or sitting and staring at the wall. He did not watch television and denied knowing how to use the internet or social media, although his wife previously set up a social media account for him. His sister bought his groceries and counted his pills to make sure he was taking his medication. His driver's license was revoked for unpaid child support and he relied on his mother and sister to drive him places. (Tr. 60-61). He no longer did any household chores or yard work. (Tr. 62-63).

Plaintiff testified that the first two fingers of his left hand were shot off in an accident in 1993. The fingers were reattached but he said that he had no sensation in the fingers and was unable to bend them. As a consequence, his left forearm was atrophied and he could not use his left hand to grip or lift anything heavier than a shoe or coffee cup. In addition, he had undergone carpal tunnel surgery on his left wrist. He had pain in both shoulders, especially when reaching overhead with his left arm. Despite his impairments, plaintiff had been employed by a friend to load trucks. He explained to the ALJ that he used his right arm to pick up the items and then slid them into the truck. (Tr. 47-49, 57-59).

With respect to his mental conditions, plaintiff stated that he did not like to be in public places because he had anxiety "all the time." When he was around other people, he got headaches, became extremely nervous or irritable, and was likely to lash out or fight. He stated it was "safer" for everyone if he avoided interacting with other people. (Tr. 50-52). He had lost his last job due to constant arguing with his boss about being given instructions. His sleep patterns fluctuated between sleeping "all the time" or not at all. In the three days before the hearing he had slept only two hours. (Tr. 52-53, 57-58). His weight also fluctuated.[2] (Tr. 57). He took medications to stabilize his mood and was seeing a counselor. (Tr. 56-57).

Vocational expert Jacqueline Bethell was asked to testify about the employment opportunities for a hypothetical person of plaintiff's age, education and work experience who was able to perform light work; who could lift or carry 20 pounds occasionally and 10 pounds frequently; who could sit for six hours in an eight-hour day, stand or walk for six hours in an eight-hour day; could frequently reach, handle and finger; and who was restricted from crawling and climbing ladders, ropes or scaffolds; and who needed to avoid hazardous conditions. In addition, this individual was limited to performing simple and routine tasks, with occasional interaction with supervisors and coworkers, in an environment in which the individual would not be around members of the public or be required to interact with the public on the employer's behalf. (Tr. 64-65). According to Ms. Bethell, such an individual would be able to perform work that was available in the national economy such as office helper, labeler, or mail clerk. (Tr. 66-67). When asked to assume that the individual was restricted to only occasional fingering, in addition to requiring no public contact, Ms. Bethell testified that these three occupations and, indeed, all other unskilled light positions would be ruled out. (Tr. 67-68). There were sedentary

---

[2] Plaintiff's weight was stable at 160 pounds between October 2014 and February 2015 and then dropped to 150 pounds in June 2015. (Tr. 305, 309, 384, 387).

positions without public contact that did not require more than occasional fingering, such as surveillance system monitor and cutter and paster,[3] but they were not widely available. (Tr. 69-70). Furthermore, these jobs would not be available if, for 20 percent of the time, the hypothetical individual was unable to accept instructions or criticism, get along with peers without distracting them, maintain basic standards of appropriate behavior and grooming, and get along with the general public. (Tr. 70). Finally, there would be no work available in the national economy if the hypothetical individual was absent from work two or more days per month or made threats of violence. (Tr. 73).

### B. Medical Evidence

Plaintiff received mental health treatment from East Central Mo Behavioral Health Services (BHS) as a condition of probation.[4] Catherine Browning, DNP, PMHNP, provided medication management and Dennis Campbell, MSPSY, provided counseling.[5] He also received primary medical care from Mark Tucker, DO,[6] and surgery for carpal tunnel syndrome from Christopher M. Bieniek, MD.

---

[3] In response to questions from plaintiff's attorney, Ms. Bethel later clarified that the cutter and paster job was not suitable for someone limited to only occasional handling, fingering and reaching. (Tr. 72-73).

[4] Plaintiff began treatment at BHS in 2011, stopped treatment in 2012, and returned in May 2013. (Tr. 85, 239).

[5] Although the record contains notes from only two counseling sessions in December 2014 and January 2015 (Tr. 330-31; 353-54), it appears that plaintiff met with Mr. Campbell through at least March 2015. See Tr. 358 (Ms. Browning notes plaintiff is still seeing "Dennis."). He was assigned another counselor early in 2016. (Tr. 398). In addition, between August 2015 and February 2016, BHS provided the services of a community support worker and nurse. Tr. 369, 374, 394, 398.

[6] Dr. Tucker also prescribed medications to address plaintiff's psychiatric conditions. See, e.g., Tr. 307 (prescribing medications for bipolar disorder and attention deficit disorder). The notes reflect that Dr. Tucker and Ms. Browning were generally aware of what the other was prescribing. See, e.g., Tr. 309, 358, 385.

Plaintiff had eight appointments for medication management with Ms. Browning between July 17, 2014, and February 10, 2016. (Tr. 315-19, 320-24, 325-29, 358-62, 363-68, 369-73, 374-79, 394-98). The treatment notes state that he had multiple incarcerations for assault and firearm charges and was barred by the terms of his probation and an ex parte order from living with his new wife and her children. (Tr. 315); see also Tr. 330 (plaintiff reported spending 11 of his adult years in prison for violence and assault); 397 (noting history of 300 assault charges). His aggressive tendencies were exacerbated by alcohol, which he stopped using in September 2013. (Tr. 316, 85). The treatment notes for each session state that plaintiff had the following symptoms: anxiety, compulsive behaviors, depression, hyperactivity, obsessive thoughts, poor concentration, and racing thoughts. In addition, plaintiff's mental status at every session was agitated, guarded and cooperative, with a disheveled appearance. His mood was anxious, depressed, and irritable, and his affect was anxious and sad. He avoided eye contact. His speech was pushed and rapid. While his flow of thought was logical, the content of his thoughts included anxieties, hopelessness, and worthlessness. He had no delusions or hallucinations, was well oriented, and had fair insight and judgment. For each of the first six sessions, plaintiff was assigned a Global Assessment of Functioning (GAF) score of 41;[7] thereafter, BHS discontinued using the GAF. (Tr. 376-77, 397). His diagnoses were bipolar disorder, most recent episode depressed, and history of alcohol dependence. Throughout the period under review, plaintiff was

---

[7] A GAF of 41-50 corresponds with "serious symptoms (e.g.. suicidal ideation, severe obsessional rituals, frequent shoplifting) OR any serious impairment in social, occupational, or school functioning (e.g., no friends, unable to keep a job)." American Psychiatric Association, Diagnostic & Statistical Manual of Mental Disorders - Fourth Edition, Text Revision 34 (4th ed. 2000).

prescribed medications for depression,[8] mood stabilization and aggression,[9] and ADHD[10] in addition to trazadone for sleep, and benztropine for control of extrapyramidal symptoms.

The medical record begins with a session on July 17, 2014. Ms. Browning noted that plaintiff had reconciled with his wife and was living in the family home. (Tr. 315-19). He was trying to spend time outside and looked healthier. He had completed an application for Medicaid. Ms. Browning directed plaintiff to continue taking his medications and noted that, once he had Medicaid, he would be able to resume medications known to be effective for his ADHD symptoms and mood stabilization.

Plaintiff underwent a new patient evaluation with Dr. Mark Tucker on October 8, 2014. (Tr. 305-08). He complained that he had pain in his right shoulder and was losing feeling in his hands, with his left hand "going to sleep." He had a history of periodic migraine headaches but they had improved with his mood stabilization medication. On examination, Dr. Tucker described plaintiff as awake, alert and oriented, with stable mood, attention and focus. Plaintiff had tenderness and positive signs of rotator cuff tendinitis in his right shoulder, while his left wrist was tender over the carpal ligament and his left hand was visibly swollen. Dr. Tucker diagnosed plaintiff with rotator cuff tendinitis, for which he administered a steroid injection, and probable carpal tunnel syndrome, for which he prescribed a nonsteroidal anti-inflammatory. Dr. Tucker also agreed to refill plaintiff's prescriptions for mood stabilization and sleep, after plaintiff explained that it was difficult to get refills from Ms. Browning in a reasonable time.

---

[8] Citalopram and venlafaxine. (Tr. 319, 324, 329, 386, 361, 372).

[9] Carbamazepine and Seroquel. (Tr. 307, 309, 319, 324, 329, 386, 361, 372).

[10] Strattera and guanfacine (Tr. 307, 309, 319, 324, 329, 386, 361, 372, 393).

Blood tests revealed that he had very high lipid levels and he was started on a statin medication. (Tr. 309, 311). Dr. Tucker urged plaintiff to quit smoking.

On October 21, 2014, Ms. Browning noted that plaintiff was "back with" with his wife. (Tr. 320-24). He continued to present multiple symptoms of ADHD, including lack of attention to detail, poor focus, poor follow-through on tasks, constant fidgeting and restlessness, poor listening, and interrupting others. He also had some aggression and needed ongoing assistance with anger management. Plaintiff agreed to a referral to services from BHS's Community Psychiatric Rehabilitation Center and "HCH" nurse.[11] Ms. Browning added Seroquel to his other medications and noted that she would consider changing plaintiff's antidepressant medication in the future.

Imaging tests completed in October and November 2014 showed that plaintiff had mild and moderate degenerative joint disease of the right shoulder, in addition to a configuration that could contribute to impingement. He also had mild bursitis, tendinopathy, and a labral tear. (Tr. 300-02). In October, Dr. Tucker prescribed high doses of aspirin to treat the shoulder pain, and on November 25, 2014, Dr. Bieniek injected plaintiff's right shoulder. (Tr. 309-12, 314). Dr. Bieniek performed carpal tunnel release surgery on plaintiff's left wrist on December 4, 2014. (Tr. 332-47). At follow-up on December 9, 2014, Dr. Bieniek found that plaintiff's numbness was "improving nicely" and released him from care without restrictions. (Tr. 313).

On December 1, 2014, plaintiff began individual counseling with Dennis Campbell with the goal of developing emotional regulation skills. (Tr. 330-31). He reported problems with

[11] The Community Mental Health Center Healthcare Home (CMHC HCH) program is "designed to integrate care for chronic physical health conditions into a community mental health setting, where individuals with severe mental illness or serious emotional disturbances frequently receive care for their mental health conditions but often have unidentified or untreated chronic health conditions." https://dmh.mo.gov/mentalillness/docs/cmhchch2016report.pdf (last visited June 28, 2018).

irritability, racing thoughts, depression, and lack of restorative sleep. He stated that he slept about 10 hours a week, but he also acknowledged that he drank three pots of coffee a day. Although he was living with his wife and her children, he stated that he did not trust people and preferred to be alone. In addition, he no longer had any interest in doing things he used to enjoy, such as woodwork. He stated that his symptoms worsened when he learned that his wife was unfaithful. A few days later, Ms. Browning noted that plaintiff "appear[ed] calmer than ever." (Tr. 325-29). He reported that his medications were working well. He still had quick mood changes which he coped with by withdrawing from others. Based on the results of an "ADHD packet," Ms. Browning diagnosed plaintiff with ADHD. She continued plaintiff's medications for depression, sleep, mood stabilization, agitation, and aggression, and restarted an ADHD medication that had proven effective in the past.

On January 5, 2015, plaintiff told Mr. Campbell that he kept to himself over the holidays, explaining that he didn't "like or trust people." (Tr. 353-54). Mr. Campbell described plaintiff as opinionated and prejudiced, noting that he had cut off contact with one of his children "due to an interracial relationship." In addition, he no longer saw his old friends and he had difficulty getting along with his wife's "disrespectful" teenage daughter. Plaintiff presented with a dysthymic mood and flat affect and had little pleasure in life. He continued to drink three pots of coffee a day, which probably contributed to his restlessness. As noted above, there are no further records of plaintiff's sessions with Mr. Campbell, although it appears he continued to meet with him at least until March 2015.

On February 9, 2015, plaintiff asked Dr. Tucker to prescribe medication for anxiety. (Tr. 384-86). He was worried about his anger, reporting that he had "to really control his thinking." With respect to his recent carpal tunnel surgery, his surgical site looked stable but he still had

some tingling in his fingertips. Dr. Tucker advised plaintiff to use his left hand as much as he could tolerate. Plaintiff had full range of motion in both shoulders, albeit with some difficulty and pain. Dr. Tucker prescribed diclofenac for shoulder pain. Dr. Tucker described plaintiff as anxious, with a slightly depressed mood, and "very cooperative and very humble." He also discontinued plaintiff's citalopram and substituted venlafaxine to treat his depression.

In March 2015, plaintiff's wife accompanied him to see Ms. Browning. (Tr. 358-62). They reported that he had spent two weeks in jail for violating the terms of the restraining order barring him from contact with his wife. They planned to ask the court to vacate the order. Ms. Browning increased the dosage of plaintiff's venlafaxine after he reported that he was doing well with it. She also increased the dosage of trazadone for sleep. All other medications were continued.

In June 2015, plaintiff reported to Ms. Browning that his wife had "moved another man" into the family home and he was living with his sister and niece. (Tr. 363-68). Ms. Browning addressed plaintiff's anger and past history of assault, stressing the importance of not taking out his anger on his wife's new boyfriend. Plaintiff reported that his aggressive instincts were more or less under control. Ms. Browning noted that plaintiff had shown "much progress" and was cooperative with his medications, always attended his appointments, and asked for help when he needed it. Nonetheless, he was highly agitated, was unable to be around other people for more than a few minutes, and had poor coping skills that he was working to improve. She noted that she was "currently trying to keep him from returning to prison due to aggression." She increased the Seroquel dosage and authorized him to take extra trazodone as needed, noting that she would try to decrease the number of his medications as he became more stable.

On June 23, 2015, Dr. Tucker noted that plaintiff's pain was well managed on diclofenac. (Tr. 387-90). He had decided to quit smoking and had reduced to ten cigarettes a day; indeed, he told Dr. Tucker that he had moved in with brother and sister because they did not smoke. Dr. Tucker described plaintiff as awake, alert and oriented, with stable mood. He was conversive and open and did not appear to be in distress. Plaintiff complained of tremors due to medication and stated that he was trying to taper his Seroquel.

In August 2015, Ms. Browning noted that plaintiff was still living with his sister and had started a new relationship. (Tr. 369-73). He was working with a community support specialist and "utilizing his coping mechanisms." He had not had "any temper outbursts or violence." He was not using alcohol and was taking his medications, which had made a significant difference. He needed additional trazadone for sleep.

In October 2015, Ms. Browning noted that plaintiff had a number of difficulties. (Tr. 374-79). First, he had beaten up someone at a family reunion but had not been arrested. He also had conflict with his sister so he was temporarily staying with a friend. In addition, his wife had filed for divorce and he had some conflicts in his current relationship. Finally, he had been charged with driving on a suspended license. He had some depression and was not eating well. Ms. Browning noted that plaintiff was pursuing a disability appeal because he had "difficulty working due to his stress of being around people." He coped with his agitated feelings by walking away from others. Nurse Browning stated that plaintiff attended all his medication reviews, took his medication as ordered, appeared to have stopped using alcohol, and cooperated with his community support specialist and healthcare nurse. Nonetheless, plaintiff and Ms. Browning were both concerned that he might "go off" and hurt someone. After discussion, Ms.

Browning decided not to make any changes to plaintiff's medications for the moment and to refer him for counseling.

In December 2015, plaintiff reported to Dr. Tucker that he was no longer getting pain relief from diclofenac. (Tr. 391-93). His left shoulder was painful, particularly when he slept or did overhead work. His right shoulder, however, was much better. His family life was stressful, but he was seeing another woman and moving slowly in the relationship. His ADHD medication was not working especially well and so Dr. Tucker proposed increasing the dosage. On examination, plaintiff was awake and alert with stable mood. His anxiety level was low and there was no evidence of mania. His left shoulder displayed tenderness on palpation and signs of tendinitis. Dr. Tucker injected his left shoulder and told him to reduce use of his shoulder for one to three days before resuming activities as tolerated.

The final medication session included in the record occurred in February 2016. (Tr. 394-98). Plaintiff told Ms. Browning that he was living with his mother and some friends. His divorce was final and he was relieved that the marriage was over, although he missed his ex-wife's children. He hoped to eventually move to Iowa where his current girlfriend resided, which his probation officer was willing to consider because she thought he was doing very well. Plaintiff had a record of 300 assault charges but, with the help of his medications, was trying to avoid altercations. Ms. Browning directed plaintiff to continue working with his counselor, nurse, and community support specialist. She also continued plaintiff's medications, again noting that she would make reductions as he became more stable.

2. <u>Opinion evidence</u>

On June 19, 2014, State agency consultant Michael Stacy, PhD, completed a Psychiatric Review Technique form in connection with the April 2014 applications. (Tr. 97-98, 107-08).

Dr. Stacy concluded that plaintiff had medically determinable impairments in the categories of 12.04 (affective disorders) and 12.09 (alcohol, substance addiction disorders). The ALJ in this case determined that plaintiff's substance addiction disorder was no longer severe and so discounted this portion of the opinion. Dr. Stacy found that plaintiff had mild restrictions in the activities of daily living and moderate difficulties in maintaining social functioning and maintaining concentration, persistence and pace. He had no repeated episodes of decompensation of extended duration. Dr. Stacy also completed a mental residual functioning capacity assessment. (Tr. 99-101, 109-11). After assessing plaintiff's limitations in the areas of understanding and memory, concentration and persistence, social interaction, and adaptation, Dr. Stacy concluded that plaintiff was able to understand and remember simple and moderately complex instructions and carry out short and simple instructions. He could relate acceptably to coworkers and supervisors, make simple decisions, and adapt to most changes in the workplace. He would perform best in an environment where contact with others was minimal. (Tr. 101, 111). The ALJ gave good weight to this portion of Dr. Stacy's opinion. (Tr. 32).

On January 20, 2015, State agency consultant Raphael Smith, PsyD, completed a Psychiatric Review Technique form in connection with the current applications. (Tr. 118-19; 131-32). Dr. Smith concluded that plaintiff had a medically determinable impairment in the 12.04 category (affective disorders). Dr. Smith found that plaintiff had no restrictions in the activities of daily living, moderate difficulties in maintaining social functioning, and mild restrictions in maintaining concentration, persistence and pace. He had no repeated episodes of decompensation of extended duration. Dr. Smith also completed a mental residual functioning capacity assessment. (Tr. 123-24, 136-37). He found that plaintiff had no limitations in understanding or memory, but would have difficulty working around others due to his

psychiatric symptoms and irritability. Dr. Smith opined that plaintiff appeared capable of tolerating normal stressors and adapting adequately to changes and could function in an environment that did not require close contact with the public or coworkers. The ALJ found that plaintiff had greater restrictions in the activities of daily living and concentration, persistence and pace and thus gave partial weight to Dr. Smith's opinion. (Tr. 32-33).

On July 7, 2015, Ms. Browning completed a mental residual functioning capacity form, countersigned by supervising physician Dr. Taranissi. (Tr. 355-57). The form asked them to assess the percentage of an eight-hour work day that plaintiff's mental impairments would preclude performance across 20 different abilities. As discussed in greater detail below, Ms. Browning opined that plaintiff's performance would be precluded at least 10 percent of the time for seven abilities and at least 20 percent of the time for thirteen abilities. The ALJ gave this opinion limited weight. (Tr. 31-32).

On April 11, 2016, Ms. Browning completed interrogatories in which she opined that, based on his record "of a large number of assault charges with authority figures," plaintiff would have "increased difficulties in a work-type situation dealing with supervisors." (Tr. 399). He had a "short fuse" which he reported "bypasses all logical thinking and results in impulsivity and violence" and, thus, was likely to react inappropriately to supervision. Plaintiff had worked hard on improving himself but reported that the only way he could ensure that he did not hurt anyone was by laying low and avoiding mentally demanding situations. His mental health would "definitely" deteriorate in response to increased mental demands. The ALJ gave this opinion partial weight. (Tr. 31).

### 3. ALJ Decision in Prior Application

In the January 2014 decision addressing plaintiff's prior application, the ALJ found that plaintiff had severe impairments of bipolar disorder, anxiety, and history of alcohol and substance abuse. (Tr. 81). The ALJ also found that plaintiff had mild restriction in the activities of daily living, moderate difficulties in social functioning, and moderate difficulties in concentration, persistence and pace, with no episodes of decompensation of extended duration. (Tr. 81-82). The ALJ found that plaintiff had the RFC to perform the full range of work at all exertional levels but was limited to simple, routine and repetitive work, with no strict production quotas and only occasional interaction with the public and coworkers. (Tr. 83). The ALJ in the present case concluded that plaintiff had additional exertional restrictions beyond those found in 2014 and, further, was restricted to work in a nonpublic setting. (Tr. 33).

## III. Standard of Review and Legal Framework

To be eligible for disability benefits, plaintiff must prove that he is disabled under the Act. See Baker v. Sec'y of Health and Human Servs., 955 F.2d 552, 555 (8th Cir. 1992); Pearsall v. Massanari, 274 F.3d 1211, 1217 (8th Cir. 2001). The Act defines a disability as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. §§ 423(d)(1)(A) and 1382c (a)(3)(A). A claimant will be found to have a disability "only if his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education and work experience, engage in any other kind of substantial gainful work which exists in the national economy." 42 U.S.C. §§ 423(d)(2)(A) and 1382c(a)(3)(B). See also Bowen v. Yuckert, 482 U.S. 137, 140 (1987).

The Social Security Administration has established a five-step process for determining whether a person is disabled. See 20 C.F.R. § 404.1520; Moore v. Astrue, 572 F.3d 520, 523 (8th Cir. 2009). Steps one through three require the claimant to prove (1) he is not currently engaged in substantial gainful activity, (2) he suffers from a severe impairment, and (3) his disability meets or equals a listed impairment. Pate-Fires v. Astrue, 564 F.3d 935, 942 (8th Cir. 2009); see also Bowen, 482 U.S. at 140-42 (explaining the five-step process). If the claimant does not suffer from a listed impairment or its equivalent, the analysis proceeds to steps four and five. Pate-Fires, 564 F.3d at 942. "Prior to step four, the ALJ must assess the claimant's residual functional capacity (RFC), which is the most a claimant can do despite her limitations." Moore, 572 F.3d at 523 (citing 20 C.F.R. § 404.1545(a)(1)). At step four, the ALJ determines whether claimant can return to his past relevant work, "review[ing] [the claimant's] [RFC] and the physical and mental demands of the work [claimant has] done in the past." 20 C.F.R. § 404.1520(e). The burden at step four remains with the claimant to prove his RFC and establish that he cannot return to his past relevant work. Moore, 572 F.3d at 523; accord Dukes v. Barnhart, 436 F.3d 923, 928 (8th Cir. 2006); Vandenboom v. Barnhart, 421 F.3d 745, 750 (8th Cir. 2005). If the ALJ holds at step four that a claimant cannot return to past relevant work, the burden shifts at step five to the Administration to establish that the claimant maintains the RFC to perform a significant number of jobs within the national economy. Banks v. Massanari, 258 F.3d 820, 824 (8th Cir. 2001); see also 20 C.F.R. § 404.1520(f).

The Court's role on judicial review is to determine whether the ALJ's finding are supported by substantial evidence in the record as a whole. Pate-Fires, 564 F.3d at 942. Substantial evidence is "less than a preponderance, but enough that a reasonable mind might accept it as adequate to support a decision." Juszczyk v. Astrue, 542 F.3d 626, 631 (8th Cir.

2008); see also Wildman v. Astrue, 964 F.3d 959, 965 (8th Cir. 2010) (same). In determining whether the evidence is substantial, the Court considers evidence that both supports and detracts from the ALJ's decision. Cox v. Astrue, 495 F.3d 614, 617 (8th Cir. 2007).

The Eighth Circuit has repeatedly emphasized that a district court's review of an ALJ's disability determination is intended to be narrow and that courts should "defer heavily to the findings and conclusions of the Social Security Administration." Hurd v. Astrue, 621 F.3d 734, 738 (8th Cir. 2010) (quoting Howard v. Massanari, 255 F.3d 577, 581 (8th Cir. 2001)). Despite this deferential stance, a district court's review must be "more than an examination of the record for the existence of substantial evidence in support of the Commissioner's decision." Beckley v. Apfel, 152 F.3d 1056, 1059 (8th Cir. 1998). The district court must "also take into account whatever in the record fairly detracts from that decision." Id.; see also Stewart v. Sec'y of Health & Human Servs., 957 F.2d 581, 585-86 (8th Cir. 1992) (setting forth factors the court must consider). Finally, a reviewing court should not disturb the ALJ's decision unless it falls outside the available "zone of choice" defined by the evidence of record. Buckner v. Astrue, 646 F.3d 549, 556 (8th Cir. 2011). A decision does not fall outside that zone simply because the reviewing court might have reached a different conclusion had it been the finder of fact in the first instance. Id.; see also McNamara v. Astrue, 590 F.3d 607, 610 (8th Cir. 2010) (explaining that if substantial evidence supports the Commissioner's decision, the court "may not reverse, even if inconsistent conclusions may be drawn from the evidence, and [the court] may have reached a different outcome").

## IV. The ALJ's Decision

The ALJ's decision in this matter conforms to the five-step process outlined above. The ALJ found that plaintiff had not engaged in substantial gainful activity since May 3, 2013, the

initial alleged onset date. (Tr. 25). At steps two and three, the ALJ found that plaintiff had severe impairments of degenerative joint disease of the shoulders, carpal tunnel syndrome, and mental impairments including bipolar disorder.[12] The ALJ noted that, although plaintiff alleged a history of alcohol abuse, he had been sober since 2011. In addition, the ALJ found that plaintiff did not have a medically determinable impairment of dyslexia. Id. at 25.

The ALJ next determined that plaintiff had the RFC to perform light work, except that he could lift or carry 20 pounds occasionally and 10 pounds frequently, could sit and stand or walk for six hours in an eight-hour day, was unable to climb ladders, ropes or scaffolds, or crawl but could frequently reach, handle and finger. He had to avoid workplace hazards. With respect to nonexertional limitations, the ALJ found that plaintiff was limited to simple routine tasks with occasional interaction with supervisors and coworkers in a nonpublic work setting where he would not be around members of the public or communicate on behalf of his employer. (Tr. 27).

In assessing plaintiff's RFC, the ALJ summarized the medical record and opinion evidence, as well as the statements of plaintiff and his wife regarding his abilities, conditions, and activities of daily living. While the ALJ found that plaintiff's medically determinable impairments could reasonably be expected to cause the alleged symptoms, the ALJ also determined that plaintiff's statements regarding their intensity, persistence and limiting effect were "not entirely consistent" with the medical and other evidence. (Tr. 28). In reaching this conclusion, the ALJ discounted the opinion of Ms. Browning regarding the extent of plaintiff's limitations due to his mental impairments. The ALJ found that plaintiff's activities of daily

---

[12] The ALJ analyzed plaintiff's eligibility for Listing 12.04 (depressive, bipolar and related disorders) and the "paragraph B" criteria. (Tr. 25-26). For the purposes of considering the paragraph B criteria, the ALJ found that plaintiff had mild restrictions in his activities of daily living; moderate difficulties in social functioning; and moderate difficulties in maintaining concentration, persistence, and pace. (Tr. 26). Plaintiff had not had episodes of decompensation of extended duration. Id.

living were not as limited as would be expected in light of the allegations and, further, that he "admit[ted] that he stopped working due to an altercation with his wife," rather than his impairments. (Tr. 30-31).

At step four, the ALJ concluded that plaintiff could not return to his past relevant work. (Tr. 34). His age on the alleged onset date placed him in the "younger individual" category. He had at least a high school education and was able to communicate in English. Id. The transferability of job skills was not an issue because plaintiff's past relevant work was unskilled. The ALJ found at step five that someone with plaintiff's age, education, work experience, and functional limitations could perform other work that existed in substantial numbers in the national economy, namely as an office helper, labeler, and mail clerk. (Tr. 34-35). Thus, the ALJ found that plaintiff was not disabled within the meaning of the Social Security Act from May 3, 2013, the alleged onset date, through July 14, 2016, the date of the decision. (Tr. 35).

## V. Discussion

Plaintiff argues that the ALJ incorrectly weighed his treating mental health provider's opinion and thus improperly assessed his mental limitations in determining his RFC. He also argues that the vocational expert provided contradictory testimony.

### A. Opinion Evidence

Plaintiff argues that the ALJ should have given controlling weight to the July 2015 assessment by Ms. Browning and Dr. Taranissi.[13] The opinion of a treating physician must be given "controlling weight" if it "is well-supported by medically acceptable clinical and

---

[13] The ALJ stated that, as a nurse, Ms. Browning was not an acceptable medical source. Because the July 2015 assessment was countersigned by a supervising physician, however, he did not discount the opinion on that basis. (Tr. 31). The Court notes that licensed advanced practice nurses such as Ms. Browning are acceptable medical sources for claims filed on or after March 27, 2017. 20 C.F.R. § 404.1502(a)(7).

laboratory diagnostic techniques and is not inconsistent with the other substantial evidence."[14]

Papesh v. Colvin, 786 F.3d 1126, 1132 (8th Cir. 2015) (quoting Wagner v. Astrue, 499 F.3d 842, 848–49 (8th Cir. 2007)).  "Not inconsistent . . . is a term used to indicate that a well-supported treating source medical opinion need not be supported directly by all of the other evidence (*i.e.*, it does not have to be consistent with all the other evidence) as long as there is no other substantial evidence in the case record that contradicts or conflicts with the opinion."  Id. (quoting S.S.R. 96–2p, Policy Interpretation Ruling, Titles II and XVI: Giving Controlling Weight to Treating Source Medical Opinions, 1996 WL 374188 (July 2, 1996)).  An ALJ need not give a treating physician's opinion controlling weight when the opinion is based on a claimant's subjective complaints that ALJ does not find credible.  Vance v. Berryhill, 860 F.3d 1114, 1120 (8th Cir. 2017) (citation omitted).

In the July 2015 assessment, Browning and Taranissi indicated that plaintiff's mental impairments would preclude him from performing, for at least 10 percent and as much as 20 percent of the workday, 20 work-related functions in the categories of understanding and memory, sustained concentration and memory, social interaction in the work place, and adapting to changes in the work setting.  As most relevant to the issues here, they opined that plaintiff would be precluded for 20 percent of the workday from accepting instructions and criticism from supervisors; getting along with coworkers or peers without distracting them or exhibiting behavioral extremes; maintaining socially appropriate behavior, dress, and grooming; and working in coordination with or proximity to others without being distracted by them.  (Tr. 355-

---

[14]This continues to be true for plaintiff's claim because it was filed before March 27, 2017.  Combs v. Berryhill, 868 F.3d 704, 709 (8th Cir. 2017); 20 C.F.R. § 404.1527 ("For claims filed . . . before March 27, 2017, the rules in this section apply."); § 404.1527(c)(1) ("Generally, we give more weight to the medical opinion of a source who has examined you than to the medical opinion of a medical source who has not examined you.").

57).  In addition, plaintiff's psychological symptoms would cause him to miss two or more days of work a month.  Finally, plaintiff would become extremely agitated and aggressive when faced with stressors, particularly in interpersonal relations.  The ALJ gave the July 2015 assessment limited weight because the extreme limitations were not consistent with treatment notes documenting generally conservative treatment and "basically normal mental status despite some anxiety and depression."  In addition, the limitations were inconsistent with "the overall evidence."  Finally, the opinion was provided in a "check-mark format with little supportive explanation."  (Tr. 32).  Here, plaintiff asserts that the ALJ incorrectly characterized his mental status and therefore improperly weighed the July 2015 assessment.

The results of plaintiff's mental status examinations are set out in full above.  Without exception, plaintiff always displayed agitation, with rapid and pushed speech, and an anxious, depressed, irritable mood.  This presentation is inconsistent with the ALJ's finding of "basically normal" mental status and supports Ms. Browning's opinion that plaintiff was significantly precluded from interacting appropriately with others, refraining from distracting or extreme behavior, and accepting criticism and supervision.  Similarly, the fact that he displayed a consistently disheveled appearance supports her finding that he could not consistently maintain basic cleanliness and neatness.  The mental status findings are consistent with the treatment notes:  In October 2014, plaintiff presented with multiple symptoms of ADHD, including fidgeting, poor listening and interrupting, in addition to "some aggression" and issues of anger management.  (Tr. 320).  In June 2015, Ms. Browning expressed concern about plaintiff's ability to manage his aggressive instincts because he remained highly agitated and had poor coping skills.  And, in October 2015, plaintiff reported that he had beaten someone who was mouthy

toward him at a family reunion. (Tr. 374). Ms. Browning again expressed concern at plaintiff's potential to hurt others.

Defendant has not addressed plaintiff's contention that the ALJ erred in stating his mental status was basically normal. Instead, defendant relies on the fact that plaintiff stopped using alcohol, which had exacerbated his aggressive behavior. In addition, defendant cites Ms. Browning's notes that plaintiff's medications were working well, he "appeared calmer than ever," he always attended his appointments, and he requested help when needed. [Doc. # 25 at 12]. These improvements did not allay Ms. Browning's concern that he had a potential to act aggressively, a concern that was later borne out. The Court also cannot substitute for Ms. Browning's professional assessment defendant's assertion that plaintiff's history of altercations is partially attributable to trust issues or disagreements regarding others' lifestyle, rather than a medically determinable impairment. Defendant's argument that plaintiff was able to do his laundry, mow, clean, and manage his finances is similarly unavailing because these are all tasks that can be done without interaction with others and thus provide no guidance regarding plaintiff's capacity to work appropriately alongside others on a sustained basis.[15]

The Court finds that the ALJ's assessment that plaintiff's mental status was "basically normal" is not adequately explained or otherwise supported by evidence in the record. Thus, the weight to be accorded to Ms. Browning's opinion must be reassessed, which may alter the determination of plaintiff's RFC. It may also be appropriate to obtain the opinion of a consultative examiner.

---

[15] The Court rejects defendant's assertion that plaintiff's history of altercations is partially attributable to trust issues or disagreements regarding others' lifestyle choices as an unwarranted substitute of advocacy for Ms. Browning's clinical opinion.

## B.  Vocational Expert's Testimony

Plaintiff asserts that the vocational expert gave contradictory testimony regarding the ability of an individual who could not tolerate public contact to perform work as office helper, labeler, or mail clerk.  [Doc. # 20 at 24-25].  The testimony plaintiff relies on was directed to the work available to an individual who was limited to only occasional fingering.  Here, the ALJ found — and plaintiff does not contest — that he had the ability to frequently finger.  The vocational expert clearly testified that the positions of office helper, labeler, and mail clerk could be performed by someone who could frequently finger and was restricted from all public contact.  (Tr. 66).  Of course, if plaintiff's RFC is changed on remand, it may be necessary to obtain new testimony from a vocational expert.

* * * * *

For the foregoing reasons, the Court finds that the ALJ's determination is not supported by substantial evidence on the record as a whole.

Accordingly,

**IT IS HEREBY ORDERED** that the decision of the Commissioner is **reversed** and this matter is **remanded** pursuant to the fourth sentence of 42 U.S.C. § 405(g) for further proceedings.

A separate Judgment shall accompany this Memorandum and Order.

/s/ *John M. Bodenhausen*
JOHN M. BODENHAUSEN
UNITED STATES MAGISTRATE JUDGE

Dated this 31st day of July, 2018.